**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ELEVANCE HEALTH, INC.,<br><br>Plaintiff,<br>v.<br><br>JORDAN VIDOR,<br>Defendant. | Case No. 1:26-cv-1880 |

## COMPLAINT

Plaintiff Elevance Health, Inc. ("**Elevance Health**"), by and through its undersigned attorneys, for its Complaint against Defendant Jordan Vidor ("**Vidor**"), alleges as follows:

## NATURE OF THE ACTION

1. This action is brought by Elevance Health to obtain preliminary and permanent injunctive relief arising out of Vidor's threatened breach of his Employment Agreement ("**Employment Agreement**"), Executive Agreement Plan ("**Executive Agreement**") and his 2026 Stock Agreements ("**Stock Agreements**," together with the Employment and Executive Agreements, the "**Agreements**").

2. In the Agreements, Vidor, in exchange for valuable consideration, agreed not to seek or obtain employment with an Elevance Health competitor for 12 months following his employment with Elevance Health to preserve Elevance Health's legitimate business interests.

3. Despite entering the Agreements and accepting valuable consideration from Elevance Health, Vidor resigned his position as Elevance Health's Vice President, Healthcare Networks — East Region on August 13, 2026, to become the Senior Vice President, Network & Provider Management – a competitive position – with competitor Oscar Health, Inc. ("**Oscar**"), starting September 14, 2026, just five days from the date of this filing. Unless restrained by this

Court, Vidor will imminently begin working for a direct competitor in a role that substantially overlaps with his responsibilities at Elevance Health

4. At Elevance Health, Vidor was part of a small group of senior executives with access to highly confidential and proprietary information that he inevitably will use at Oscar to compete against Elevance Health.

5. Vidor's wrongful conduct will cause irreparable harm if not enjoined.

6. Elevance Health requests a hearing at the Court's earliest opportunity and an order for injunctive relief, including a temporary restraining order, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Vidor from (i) working for Oscar (or any Elevance Health competitor) for 12 months, (ii) soliciting Elevance Health's employees for 12 months, and (iii) ever using Elevance Health's trade secrets and confidential information.

## **THE PARTIES**

7. Plaintiff Elevance Health is an Indiana corporation with its principal place of business at 220 Virginia Avenue, Indianapolis, Indiana, 46204.

8. Defendant Jordan Vidor was formerly employed at Elevance Health as its Vice President, Healthcare Networks — East Region.

9. Vidor resides in Hudson County, New Jersey, and is a citizen of the State of New Jersey.

## **JURISDICTION AND VENUE**

10. This Court may exercise jurisdiction over Count III of this Complaint because it arises under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836. Accordingly, this Court has original jurisdiction over that claim under 28 U.S.C. § 1331.

11. Jurisdiction is also proper under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

12. Personal jurisdiction and venue are proper in this Court because the Agreements provide that if a party is seeking immediate, temporary, or preliminary injunctive or equitable relief to avoid irreparable damage, such action "shall be brought in a state or federal court located in Indianapolis, Indiana." (*See* Ex. A § 17(f); Ex. C § 21).

13. Personal jurisdiction is also independently proper because Elevance Health is headquartered in Indianapolis, Indiana; Vidor reported to Elevance Health senior executives based in Indianapolis; and Vidor regularly communicated with Indiana-based personnel and participated in strategic initiatives directed from Indiana throughout his employment.

14. Vidor consented to personal jurisdiction in Indiana in the Employment Agreement. (*See* Ex. A § 17(f)).

## FACTUAL BACKGROUND

15. Elevance Health is one of the nation's leading health care benefit companies, serving millions of medical members through its affiliated health plans with customers located across the entire United States.

16. Elevance Health operates in a highly competitive industry where marketplace goodwill, national business strategies, and confidential pricing and discount information are critical to its success. As such, Elevance Health has expended substantial time, labor, and money to create, develop, and keep secret among other things: (i) provider and supplier lists, provider contract terms, and reimbursement rates; (ii) confidential profit margin, pricing, and discount information; (iii) network expansion plans and growth strategies; (iv) financial and market

analyses; and (v) other confidential concepts, practices, and ideas related to Elevance Health's business.

17. Elevance Health's provider network is vital to the success of its business. Indeed, it considers its provider partners to be a key strategic pillar in its mission. Access to care at a specific price point, delivered through negotiated provider contracts, is a core value proposition offered by Elevance Health. The strategies, pricing, unique contractual terms, and relationships underlying Elevance Health's provider networks are among its most closely guarded trade secrets.

18. To protect its confidential, trade secret and proprietary information, Elevance Health has adopted company-wide written policies restricting the disclosure and/or use of this information other than for official company purposes. Elevance Health also requires each of its executives to execute employment agreements containing strict confidentiality provisions as a condition of employment.

***Vidor's Employment with Elevance Health Gives Rise to the Contractual Obligations Being Violated***

19. On November 5, 2022, incident to, and in consideration of, his employment at Elevance Health, Vidor voluntarily entered into an Employment Agreement, a true and correct copy of which is attached hereto as **Exhibit A**.

20. Incident to, and in consideration of his continued employment with Elevance Health, Vidor entered into an amended Executive Agreement, restated effective March 1, 2024, a true and correct copy of which is attached hereto as **Exhibit B**.

21. On March 2, 2026, Vidor received stock grants that specifically contain their own restrictive covenants. In exchange for valuable equity compensation, including $964,792.15 in

equity granted to him March 2, 2026[1], Vidor voluntarily accepted and entered into Stock Agreements for Stock Options, Restricted Stock Units, and Performance Stock Units, each containing restrictive covenants. Vidor's 2026 Stock Agreements are attached hereto as **Exhibit C**[2].

22. Under the Employment Agreement and Stock Agreements, Vidor acknowledged that, based on his employment with Elevance Health, he would have access to and use certain confidential information that constitutes the trade secrets and confidential and proprietary business information of Elevance Health. (*See* Ex. A § 9(a); Ex. C at § 7(a)(i)).

23. Elevance Health's "**Confidential Information**" is defined as:

> information created and used in its business which is not generally known by the public, including, but not limited to, plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, its affiliates and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business.

(*See* Ex. A at § 9(a)(i); Ex. C at § 7(a)(i)).

---

[1] Elevance Health's closing stock price on September 8, 2026 was $401.94 per share. *See* Elevance Health, Inc. (ELV) Historical Data, *Yahoo Finance*, https://finance.yahoo.com/quote/ELV/history/ (last visited Sept. 8, 2026). On March 2, 2026, Elevance Health granted Vidor the following:

- Retention RSUs: 1,191 shares × $401.94 = $478,710.54
- LTIP RSUs: 298 shares × $401.94 = $119,778.12
- Stock Options (NQ): 1,175 options × ($401.94 − $294.07) = $126,747.25
- PSUs: 596 units × $401.94 = $239,556.24
- Total Value as of September 8, 2026 closing: $964,792.15

*See* 2026 Stock Agreements, Ex. C.

[2] The confidentiality, non-solicitation, and non-competition provisions of the 2026 Stock Agreements, as well as section numbers, are identical across all four 2026 Stock Agreements. *Id*.

24. Confidential Information also includes "other information protected under the Indiana Uniform Trade Secrets Act (the "Act"), or to any comparable protection afforded by applicable law." (*See* Ex. A § 9(a)(i)).

25. Pursuant to the Employee and Stock Agreements, Vidor agreed to the following restrictions on the use or disclosure of Elevance Health's Confidential Information:

> [Vidor] agrees that [Vidor] will not for himself or herself or for any other person or entity, directly or indirectly, without the prior written consent of the Company, while employed by the Company and thereafter: (i) use Confidential Information for the benefit of any person or entity other than the Company or its affiliates; (ii) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform [Vidor's] duties for the Company or its affiliates; or (iii) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

(*See* Ex. A § 9(a)(ii); Ex. C § 7(a)(ii)).

26. Because he would have access to Elevance Health's confidential and trade secret information, Vidor further agreed that he would not, without prior written consent of Elevance Health, for a period of 12 months following the end of his employment with Elevance Health, "directly or indirectly seek or obtain a Competitive Position in a Restricted Territory and perform a Restricted Activity with a Competitor." (*See* Ex. A § 9(c); Ex. C § 7(b)).

27. As it pertains to Vidor's confidentiality, non-solicitation, and noncompetition obligations with Elevance Health,[3] "**Competitive Position**" means:

> any employment with or performance of services for or on behalf of a Competitor, if (A) the services to be performed by [Vidor] are the same as or similar to the services that [Vidor] performed for [Elevance Health] in the last twenty-four (24) months of [Vidor's] employment with [Elevance Health] ("**Look Back Period**"), or (B) in the performance of such services, [Vidor] will likely use any Confidential Information of [Elevance Health].

[3] The confidentiality, non-solicitation, and non-competition provisions of the Stock Agreements supersede those in any prior agreements between the parties. (See Ex. C § 9(h))

(*See* Ex. C § 7(b)(i)).

28. "Restricted Territory" means:

> any geographic area in which [Elevance Health] does business and in which [Vidor] provided services, had responsibility for, had a material presence or influence in, or had access to or knowledge of Confidential Information about, such business, within the Look Back Period.

(*Id.* § 7(b)(ii)).

29. "**Restricted Activity**" means any activity for which [Vidor] had responsibility for [Elevance Health] or about which [Vidor] had Confidential Information within the Look Back Period." (*Id.* § 7(b)(iii)).

30. "Competitor" means:

> any entity or individual (other than [Elevance Health]) engaged in any one or more of the following: management of network-based managed care plans and programs; administration of managed care services; provision of health insurance, long-term care insurance, level-funded insurance, dental, life, or disability insurance; administration of flexible spending accounts, COBRA continuation coverage, coordination of benefits, or subrogation services; or the provision, delivery, or administration of health benefit plans or health care services such as pharmacy benefits management (including Specialty pharmacy), value-based care delivery, behavioral health, palliative care, care for chronic and complex conditions, digital healthcare platforms, medical benefits management solutions, or health care research (including health economics and outcomes); or any other aspects of the business or products or services offered by [Elevance Health], as to which [Vidor] had responsibilities or received Confidential Information about, during the Look Back Period.

(*Id.* § 7(b)(iv)).

31. Vidor also agreed not to solicit for a Competitor, either individually or in any other capacity, any customer or employee of Elevance Health. (*See* Ex. A at § 9(d)-(e); Ex. C § 7(c), (d)).

32. Vidor agreed that the Agreements' non-competition provisions ("**Non-Competition Provisions**") are "reasonable and necessary to preserve the legitimate business

interests of [Elevance Health], its present and potential business activities and the economic benefits derived therefrom." (*See* Ex. A § 9(h)(i); Ex. B § 3.8(a); Ex. C § 9(a)).

33. He also agreed that the Non-Competition Provisions would "not prevent [him] from earning a livelihood in [his] chosen business and are not an undue restraint on the trade of [Vidor], or any of the public interests which may be involved." (*Id.*).

34. Further, Vidor agreed that if he "commits or threatens to commit a breach" of the Non-Competition Provisions, then Elevance Health would "have the right to seek and obtain all appropriate injunctive and other equitable remedies," and agreed that "any such breach would cause irreparable injury to [Elevance Health] and that money damages would not provide an adequate remedy." (*See* Ex. A § 9(h)(ii); Ex. B § 3.8(b); Ex. C § 9(b)).

35. Vidor agreed that if he violated the Non-Competition Provisions, the term of the restriction would be extended by the period of the violation. (*See* Ex. A § 9(h)(ii); Ex. C § 9(b)).

36. Additionally, Vidor agreed that if he at any time breached the Non-Competition Provisions, he must forfeit all unexercised Elevance Health stock options and any outstanding restricted stock ("**Equity**"), and that he is required to return to Elevance Health the excess of the fair market value over the exercise price for all stock acquired on exercise of an option within the last twenty-four (24) months, and the fair market value of any common stock that became vested within the last twenty-four (24) months ("**Stock Excess Value**"). (*See* Ex. A § 9(g); Ex. B § 3.7(a); Ex. C § 8(a)).

37. Vidor agreed that these amounts would not reduce any money damages caused by a breach. (*Id.*).

***Vidor Resigns from Elevance Health for a Competitive Position with a Competitor in Violation of the Non-Competition Provisions***

38. Vidor resigned from Elevance Health on August 13, 2026. Elevance Health terminated his access to company systems on that same date.

39. But before that, on August 5, 2026, Vidor notified his supervisor Catherine Gaffigan and Elevance Health's Chief Human Resources Officer Ryan Craig about a job offer he received from Oscar for a Senior Vice President role. Vidor stated the position would "have responsibility for the organization's provider operations, network data, credentialing, unit cost management and provider communications." He described Oscar as "a healthcare technology company based out of New York City."

40. Then, on August 7, 2026, Vidor provided the full job description for the Oscar role: SVP, Network & Provider Management ("**Oscar Role**"). The job description confirms that the Oscar Role encompasses network tooling, adequacy standards, contracting strategies; long-term strategies for network growth and optimization; provider network development; unit cost guidelines and contracting parameters; network adequacy and compliance; contract inventory management; and provider operations including credentialing, contract configuration, and provider data management.

41. The job description demonstrates that the duties and responsibilities of the Oscar Role are essentially the same as, and substantially overlap with, the duties and responsibilities Vidor performed as Elevance Health's VP, Healthcare Networks - East Region ("**Elevance Health Role**"), which position he held from approximately October 2022 through his resignation on August 13, 2026.

42. The Elevance Health Role encompassed the following: Connecticut, Florida, Georgia, Indiana, Kentucky, Maine, Maryland, New Hampshire, New Jersey, New York, North Carolina, Ohio, Tennessee, Virginia, Washington, D.C., and West Virginia ("**East Region**").

43. In his Elevance Health Role, Vidor's duties and responsibilities included, among other things, the following:

- Overall accountability for the design and composition of multiple provider networks throughout a defined region, including product-specific customized network offerings designed to meet the emerging needs of large employer-group customers, as well as evolving Affordable Care Act ("**ACA**"), Medicaid, Medicare, and Duals[4] product and sales strategies.
- Lead network strategy, fee-for-service and value-based provider contracting, provider account management, and recruitment for all markets within defined region for all lines of business.
- Work with Medicare, Commercial,[5] which includes both employer-based and ACA products, and Medicaid profit and loss owners to define, shape, and implement margin, quality, growth and retention initiatives and inform market level business plans.
- Develop and execute strategies to achieve annual Cost of Care objectives and identify incremental trend opportunities to be implemented in subsequent years, impacting both Unit Price and Unit Cost.

[4] "Duals" means dual eligibility for Medicaid and Medicare.

[5] In the healthcare industry, and for the purposes of this Complaint and the dispute between Elevance Health and Vidor, "Commercial" means non-governmental healthcare plans. For example, Medicaid, Medicare, and duals are government-provided, whereas Commercial includes plans purchased in the marketplace, such as those purchased under the ACA, and employer-sponsored plans.

- Analyze data in collaboration with Health Economics and Finance to identify drivers of medical cost trends and implement initiatives to achieve trend and other performance objectives.
- Develop and execute plans to maintain a best-in-class provider account management model and continuously improve provider engagement across all lines of business.
- Identify and execute operational effectiveness initiatives in collaboration with Claims and Health Solutions operations leadership.
- Instill a digital first mindset to modernize our business, improve provider and member experience, increase access to care, and improve the health of our members.
- Identify and execute strategies and initiatives to achieve and maintain bi-lateral exchange of clinical data in support of Commercial, Medicare, and Medicaid risk adjustment coding accuracy, quality improvement, and clinical efficiency objectives.
- Lead and oversee negotiations and implementation of value-based initiatives within defined markets and support their success through ensuring delivery of necessary support.
- Collaborate with the Value Based Solutions team on development of Value Based Care strategies and coordination on national practice management organizations.
- Interweave Social Determinants of Health and, more broadly, Health Equity strategies into the overarching network strategy and provider engagement activities within a defined market.

- Plan, organize, administer, and coordinate large and complex services, projects, and programs.
- Hire, train, coach, counsel, and evaluate performance of direct reports.
- Source, develop, and grow talent.

44. In addition to the foregoing duties and responsibilities, Vidor oversaw four teams/functions that support *all* Elevance Health markets and regions (not just its East Region):

(i) National Network Business – local and national client engagement and sales support on Elevance Health network strategy;

(ii) Contract Performance and Chargemaster Audits for all Elevance Health contracts;

(iii) Provider Network support and training for all Elevance Health Care Networks associates; and

(iv) Contract Lifecycle Management, which includes migration to a new contract management platform.

These teams/functions partner closely with local market leaders to execute strategic initiatives, optimize network and contract performance, support local and national network development, market expansion, and regional/national negotiations, strengthening contract management infrastructure, tools, and resources for *all* Elevance Health markets and regions.

45. On August 12, 2026, Vidor's supervisor, Dr. Catherine Gaffigan, notified him that the Oscar Role was substantially similar to his role at Elevance Health and would likely cause issues with his employment.

46. Despite knowing that his acceptance of the Oscar Role would violate the Non-Competition Provisions, Vidor resigned from Elevance Health effective August 13, 2026.

47. Oscar is a healthcare company that sells ACA and individual marketplace health insurance plans, operating in New York and other states where Elevance Health also does business.

48. Specifically, Oscar offers plans in the following states: Alabama, Arizona, Florida, Georgia, Illinois, Iowa, Kansas, Michigan, Mississippi, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, and Virginia.[6]

49. Vidor's Elevance Health Role covered all lines of business, including Commercial — fully insured group, ACA, national accounts, and Administrative Services Only ("**ASO**") business — Medicaid, Medicare, and Duals.

50. Over the past two years, approximately 70% of Vidor's work related to commercial business, which includes ACA and individual marketplace health insurance plans.

51. In his Elevance Health Role, Vidor was directly involved in ACA business, either personally or through his teams responsible for ACA contracting across the East Region. Nothing in Vidor's portfolio of states would have been approved — including provider negotiations, contract terms, and pricing — without Vidor's involvement.

52. Vidor's impending employment with Oscar is both (i) a Competitive Position within the Restricted Territory for a Competitor; and (ii) a Restricted Activity within the Restricted Territory for a Competitor, resulting in independent material breaches of the Agreements.

53. Elevance Health has tried to resolve Vidor's anticipated breaches with Oscar and Vidor but has been unsuccessful in preventing or mitigating the breaches.

---

[6] Oscar Health, Inc., Annual Report (Form 10-K) (Feb. 12, 2026), https://www.sec.gov/Archives/edgar/data/1568651/000156865126000011/oscr-20251231.htm.

***Vidor Had Access to Highly Confidential Information He Will Inevitably Use at Oscar Health***

54. In his Elevance Health Role, Vidor was responsible for all aspects of Healthcare Networks for Elevance Health's East Region, spanning fee-for-service and value-based contracting across 15 states and the District of Columbia, including the following states that overlap with Oscar's footprint: Florida, Georgia, New York, New Jersey, North Carolina, Ohio, Tennessee, and Virginia.[7]

55. Vidor was responsible for provider contracts across all product lines, including Commercial (fully insured group, ACA, national accounts, ASO business), Medicaid, Medicare, and Duals.

56. In addition to his regional responsibilities, as described in greater detail above, Vidor also led several national efforts for Elevance Health's Healthcare Networks, including:

- Cost of care efforts nationally for Healthcare Networks;
- Team supporting sales and local and national client engagement;
- Team assessing contract performance;
- Team for Healthcare Networks-wide Network Support and Training; and
- Team managing Contract Lifecycle Management.

57. Vidor had routine access to – and responsibility for – developing highly confidential and proprietary information, including:

- Pricing, unit cost targets, and provider reimbursement rates;
- Provider discount positions and the strategies utilized to address discount advantages and disadvantages;

[7] Oscar's overlap with Elevance Health in these eight states does not account for those markets Oscar may be expanding into over the next 12 months.

- Network strategy, including narrow network strategies for ACA products;
- Provider performance data;
- Market strategy for East Region states;
- Knowledge of which providers were key in particular geographies and products;
- Provider relationships and contracts that drive pricing;
- Provider strategies to address costs;
- Sales strategy and market strategy information;
- Planning processes regarding sales and ACA business performance;
- Expansion plans, including which markets Elevance Health was targeting for growth and the strategic rationale for those expansions;
- Contract language, terms, and obligations, including how Elevance Health bundles claims and what associated services it pays for;
- Individual Coverage Health Reimbursement Arrangement ("**ICHRA**") strategy, including how Elevance Health planned to configure networks for the ICHRA market and whether it intended to pursue ICHRA as a serious growth product;
- Profit and loss data and "hot spot" reports identifying areas of underperformance and opportunity across his region; and
- Cost of goods price points.

58. Vidor developed and implemented provider contracting and reimbursement strategies across the East Region, including markets that substantially overlap with Oscar's footprint.

59. Vidor possesses detailed knowledge regarding Elevance Health's ACA business performance, strategic priorities, and initiatives designed to improve performance in those markets.

60. Vidor led key strategic initiatives, including the development of ACA pricing models, which is among the most competitively sensitive information Elevance Health possesses.

61. Much of the information to which Vidor had access remained current through the end of his employment in August 2026, including ongoing provider negotiations, reimbursement strategies, ACA initiatives, network-development plans, and market-specific performance information.

62. At the time of his resignation from Elevance Health, Vidor was actively involved in negotiations with major New York provider systems in the same market where Oscar is headquartered and competes for network access and provider relationships.

63. Many of the provider systems with which Vidor negotiated on behalf of Elevance Health are also provider systems with which Oscar must maintain or develop contractual relationships in overlapping markets. As a result, the provider relationships Vidor developed while representing Elevance Health concern many of the same counterparties with whom he would interact in the Oscar Role.

64. Throughout his tenure at Elevance Health, Vidor was intimately involved in the New York market, personally participating in every large provider negotiation there. For example, Vidor was recently leading a turnaround project to improve Elevance Health's network position in New York, including its Commercial discount positioning and ACA business. His knowledge of the status, terms, and strategy of these active negotiations would be extraordinarily valuable to a

Competitor like Oscar that must contract with the same providers in the same markets, specifically including those in their own backyard.

65. Through years of direct, high-level negotiations on behalf of Elevance Health, Vidor cultivated deep, trust-based personal relationships with the senior executives of the major provider systems across the East Region. These relationships were not incidental to Vidor's Elevance Health Role – they were central to it. Vidor served as the point of contact for provider system C-suite executives in states spanning from New York to Florida, and he personally negotiated or directly oversaw every significant provider contract in the East Region.

66. Vidor developed the kind of access and trust with provider executives that takes years of direct engagement to build. He is on personal terms with hospital system senior leaders who control contracting decisions for their institutions.

67. Vidor's provider relationships were built on Elevance Health's platform – its market position gave him a seat at the table that he would not have had as a representative of a smaller insurer. The goodwill he carries from those relationships was developed at Elevance Health's expense and for Elevance Health's benefit.

68. These same provider relationships are the mechanism through which Vidor's confidential knowledge becomes operational and the harm to Elevance Health becomes irreparable. Vidor does not have to seek out opportunities to leverage what he knows about Elevance Health's confidential contract terms, discount positions, and negotiation strategies. In the Oscar Role, his day-to-day responsibilities will require him to negotiate with the very same provider executives with whom he built relationships at Elevance Health, in the very same markets, over the very same contract terms. Those provider executives already know and trust him; he will have immediate, personal access to them from his first day at Oscar.

69. Vidor's combination of confidential knowledge and trusted access makes the risk of harm qualitatively different from – and far greater than – the risk posed by a competitor who merely hires someone with general industry expertise.

70. Although certain pricing information may be publicly available through transparency disclosures, such information does not reveal the underlying contract structures, negotiation history, strategic objectives, or provider-specific considerations that inform provider contracting decisions. Vidor possesses that non-public context and maintains established relationships with the provider executives involved in those negotiations.

71. Vidor knows precisely how Elevance Health structured its deals, including the non-public contract clauses, provider incentive and bonus structures, claim thresholds, and strategic concessions that sit entirely outside publicly available data, and he has direct, personal access to the counterparties on the other side of those deals.

72. Moreover, through years of direct negotiations on behalf of Elevance Health, Vidor learned how major provider systems evaluate contracting proposals, the financial and operational issues most important to them, and the types of contractual terms and concessions most likely to influence their decision-making. He acquired this knowledge exclusively through his work for Elevance Health and his interactions with provider executives acting on behalf of their organizations. This knowledge is not publicly available and would be valuable to a competitor negotiating with the same provider systems.

73. The Elevance Health information to which Vidor has had routine access and responsibility for developing is neither generally known nor readily ascertainable by the public and would be extremely valuable to a Competitor.

74. Specifically, Vidor's knowledge of provider discount positions would allow Oscar to determine whether Elevance Health and Oscar would be competitive in a given market and to negotiate better deals with providers.

75. Any publicly available pricing information is incomplete and immaterial without the underlying contract language, the manner in which pricing is implemented, and the strategic decisions underlying each contract. Vidor possesses this non-public context, and his knowledge would allow Oscar to inform its own sales and market strategy, and to deal with the same providers from a position of unfair advantage.

76. Vidor's knowledge of Elevance Health's network strategies, provider rates, contracts, future planning, and sales performance constitutes proprietary efforts that drive Elevance Health's competitive price points. Such knowledge would give Oscar an unfair competitive advantage at Elevance Health's expense.

77. Elevance Health has taken substantial measures and exercised due diligence to prevent its confidential, trade secret, and proprietary business information from becoming available to individuals other than those few selected by Elevance Health to have access to this information in order to further its business.

78. Elevance Health engages in the following measures to protect its confidential, trade secret and proprietary business information: requiring confidentiality and nondisclosure agreements with its employees; limiting invitee lists for confidential discussions; clearly marking confidential information as "Company Confidential" and "For Internal Use Only" in company documents; monitoring the electronic transmission of Elevance Health documents in and out of the company; securing data repositories and servers with encryption tools; permitting password-only access to certain networks and databases; restricting access to files; and requiring that all

employees return to Elevance Health upon termination of employment all documents and property relating to Elevance Health's confidential information.

79. Given the nature of the information he possesses, Vidor will inevitably disclose those trade secrets when working in Oscar's network and provider management business. The Oscar Role requires Vidor to perform virtually the same functions — network strategy, contracting, unit cost management, and provider operations — for a Competitor operating in the same markets with the same providers. It is, therefore, inevitable that Vidor will use Elevance Health's confidential information in discharging his similar duties at Oscar. Indeed, he told several Elevance Health executives that he was taking a role at Oscar equivalent to the role of his supervisor at Elevance Health, Dr. Catherine Gaffigan.

80. The confidential knowledge Vidor possesses cannot be segregated from his day-to-day performance of the Oscar Role. Vidor cannot simply disregard or "unlearn" his knowledge of Elevance Health's provider contracts, pricing strategies, provider discount positions, network development initiatives, negotiation strategies, and market plans when performing substantially similar duties for a direct competitor. The knowledge he acquired while serving as Elevance Health's Vice President, Healthcare Networks – East Region is embedded in his professional judgment and decision-making and will inevitably inform his work on behalf of Oscar.

81. The risk of competitive harm is particularly acute during the 12 months immediately following Vidor's departure. Many provider agreements are negotiated and renewed through multi-year contracting cycles, and Vidor possesses current information regarding Elevance Health's provider relationships, contract strategies, reimbursement positions, growth priorities, and ongoing negotiations. That information remains competitively valuable today and will continue to influence provider contracting and network development decisions over the

coming years. Vidor's ability to use his current knowledge and relationships during upcoming contracting cycles creates a substantial risk of competitive harm to Elevance Health.

82. For example, Vidor is aware of how Elevance Health intends to approach the ICHRA market, including how Elevance Health plans to configure networks for ICHRA, what price points it seeks to achieve, etc. Oscar is aggressively expanding its ICHRA offerings. Therefore, Vidor's knowledge of Elevance Health's ICHRA strategy would provide Oscar with a direct competitive advantage in this rapidly growing market segment.

83. The provider relationships and goodwill Vidor developed during his employment were cultivated on Elevance Health's behalf and at Elevance Health's expense. Those relationships remain valuable in the markets where Oscar and Elevance Health compete.

84. By joining a Competitor in a Competitive Position approximately one month following the termination of his employment at Elevance Health, Vidor will violate the Non-Competition Provisions in the Agreements and will substantially harm Elevance Health in the process.

**COUNT I**
**BREACH OF CONTRACT**

85. The preceding allegations of this Complaint are incorporated by reference with the same force and effect as if set forth in full below.

86. The Non-Competition Provisions are valid and enforceable contracts.

87. Vidor acknowledged that by virtue of his employment at Elevance Health, he would have access to and would use certain Confidential Information, and he agreed that the Non-Competition Provisions are "reasonable and necessary to preserve the legitimate business interests" of Elevance Health.

88. Pursuant to the terms of the Non-Competition Provisions, Vidor agreed, among other things, not to directly or indirectly compete with Elevance Health for 12 months following termination of his employment.

89. Vidor will violate the Non-Competition Provisions by joining Oscar, a direct Competitor of Elevance Health, in an executive-level role in a line of business about which he had Confidential Information from Elevance Health.

90. Vidor will further violate the Non-Competition Provisions by performing Restricted Activities for Oscar. The Oscar Role requires Vidor to engage in provider network strategy, provider contracting, unit cost management, and provider relationship management, all of which are activities for which Vidor had responsibility at Elevance Health and about which he possesses Confidential Information. Performing those functions for Oscar will necessarily involve the use of knowledge obtained through his work for Elevance Health, including Confidential Information relating to provider contracts, reimbursement rates, network strategies, pricing positions, and negotiations with provider systems. The Oscar Role will also place Vidor in direct contact with many of the same provider executives with whom he negotiated on behalf of Elevance Health. Additionally, Vidor has direct knowledge of the compensation, performance, and capabilities of Elevance Health's Healthcare Networks personnel, information that would be valuable in recruiting those employees to Oscar.

91. All conditions precedent to Elevance Health's recovery under the Non-Competition Provisions have been performed, excused, waived, or otherwise satisfied.

92. By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Vidor.

93. The public interest would not be disserved by the granting of an injunction. To the contrary, the public has a strong interest in the enforcement of valid contracts, the protection of trade secrets, and the preservation of competitive markets that depend on companies' ability to invest in developing confidential business strategies without fear that departing executives will immediately transfer that investment to competitors.

94. The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Vidor from such a restraint. Vidor is a sophisticated executive who voluntarily agreed to the Non-Competition Provisions in exchange for substantial compensation, including equity grants. Vidor acknowledged that the restrictions would not prevent him from earning a livelihood. The 12-month restriction period reflects the time reasonably necessary to protect Elevance Health's investment in its Confidential Information and to allow that information to become stale. Vidor remains free to seek employment in the healthcare industry in roles that do not involve a Competitive Position with a Competitor.

95. As a direct and proximate result of Vidor's threatened breaches, Elevance Health will suffer damages in an amount to be determined at trial.

96. Vidor has agreed that if he were to breach or threaten to breach the Non-Competition Provisions, "any such breach would cause irreparable injury" to Elevance Health and that Elevance Health "shall have the right to seek and obtain all appropriate injunctive and other equitable remedies."

97. Vidor's threatened breach will cause irreparable harm to Elevance Health for which it has no adequate remedy at law. Unless and until enjoined by this Court, and as a direct and proximate result of Vidor's breach of the Non-Competition Provisions, Elevance Health will suffer irreparable harm.

98. The irreparable nature of the threatened harm is compounded by Vidor's established provider relationships. Once Vidor uses his confidential knowledge of Elevance Health's contract terms, pricing, and strategic positions in negotiating with providers who already know and trust him, the competitive damage cannot be undone. A provider who learns from Vidor that Elevance Health is willing to accept a particular rate or contract term – or that Elevance Health has a particular vulnerability – will use that information permanently. The disclosure cannot be recalled, the competitive advantage cannot be restored, and the precise extent of the resulting harm cannot be quantified.

99. Elevance Health is entitled to preliminary and permanent injunctive relief and damages in an amount to be proven at trial. Elevance Health is also entitled to Vidor's Stock Excess Value.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS**
**(Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq*.)**

100. The preceding allegations of this Complaint are incorporated by reference with the same force and effect as if set forth in full below.

101. Elevance Health's trade secrets and confidential and proprietary information derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain value from their disclosure and use.

102. Elevance Health has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

103. Elevance Health's trade secrets and confidential and proprietary information constitute trade secrets pursuant to the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3-1 *et seq.*

104. Vidor gained knowledge of Elevance Health's trade secrets and confidential and proprietary information through his employment with Elevance Health.

105. In fact, Vidor was involved in and responsible for developing Elevance Health's provider network strategies, contracting approaches, unit cost targets, and provider discount positions across 15 states and all lines of business.

106. This information includes detailed and specific information concerning how Elevance Health plans to expand and improve the performance of its provider networks and pricing strategies.

107. Given the nature of the information, Vidor will inevitably disclose those trade secrets when working in Oscar's network and provider management business. Additionally, Vidor will inevitably disclose trade secrets if he is working with any executive team within Oscar for all lines of Oscar's business, which includes ACA and Commercial business.

108. The inevitability of trade secret disclosure is heightened by Vidor's pre-existing, trust-based relationships with the very provider executives whose contract terms and strategic positions constitute Elevance Health's trade secrets. The Oscar Role will place Vidor in direct, ongoing contact with these provider counterparties as a matter of routine business operations, and those counterparties will expect and receive from Vidor the same level of candid, informed engagement they experienced when he represented Elevance Health. It is not possible for Vidor to perform those functions competently without drawing upon the confidential knowledge he possesses about the same providers, in the same markets, concerning the same lines of business.

109. Thus, Vidor threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Elevance Health's trade secrets and confidential and proprietary information.

110. By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Vidor.

111. Vidor's threatened misappropriation would cause irreparable harm to Elevance Health for which it has no adequate remedy at law. Elevance Health cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation. As such, monetary damages alone cannot fully compensate Elevance Health for Vidor's threatened conduct.

112. Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Vidor's threatened misappropriation will cause Elevance Health irreparable damage and injury.

113. The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Vidor from such a restraint.

114. By contrast, the harm to Vidor from an injunction is limited. Vidor is a sophisticated executive who voluntarily agreed to the Non-Competition Provisions in exchange for substantial compensation, including equity grants. Vidor acknowledged that the restrictions would not prevent him from earning a livelihood. The 12-month restriction period reflects the time reasonably necessary to protect Elevance Health's investment in its Confidential Information and to allow that information to become stale. Vidor remains free to seek employment in the healthcare industry in roles that do not involve a Competitive Position with a Competitor.

115. The public interest would not be disserved by the granting of an injunction. The public has a strong interest in the protection of trade secrets, which encourages companies to invest in research, development, and innovation. Permitting the misappropriation of trade secrets would

undermine competitive markets and discourage the development of proprietary business strategies that benefit consumers through improved products and services.

**COUNT III**
**DEFEND TRADE SECRETS ACT OF 2016**

116. The preceding allegations of this Complaint are incorporated by reference with the same force and effect as if set forth in full below.

117. Elevance Health's trade secrets and confidential and proprietary information derive actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain value from their disclosure and use.

118. Elevance Health has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

119. Elevance Health's trade secrets and confidential and proprietary information constitute trade secrets pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

120. Vidor gained knowledge of Elevance Health's trade secrets and confidential and proprietary information through his employment with Elevance Health.

121. Elevance Health's trade secrets and confidential and proprietary information relate to products or services used in, or intended for use in, interstate or foreign commerce.

122. In fact, Vidor was involved in and responsible for developing Elevance Health's provider network strategies, contracting approaches, and pricing across 15 states and all lines of business.

123. This information includes detailed and specific information concerning how Elevance Health plans to expand and improve the performance of its provider networks.

124. Given the nature of the information, Vidor will inevitably disclose those trade secrets when working in Oscar's network and provider management business. Additionally, Vidor will inevitably disclose trade secrets if he is working with any executive group or team within Oscar for all lines of Oscar's business, which include ACA and Commercial business.

125. The inevitability of trade secret disclosure is heightened by Vidor's pre-existing, trust-based relationships with the very provider executives whose contract terms and strategic positions constitute Elevance Health's trade secrets. The Oscar Role will place Vidor in direct, ongoing contact with these provider counterparties as a matter of routine business operations, and those counterparties will expect and receive from Vidor the same level of candid, informed engagement they experienced when he represented Elevance Health. It is not possible for Vidor to perform those functions competently without drawing upon the confidential knowledge he possesses about the same providers, in the same markets, concerning the same lines of business.

126. Thus, Vidor threatens to use improper means to misappropriate Elevance Health's trade secrets and confidential and proprietary information, or conspired to do so, for the economic benefit of individuals or entities other than Elevance Health.

127. By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Vidor.

128. Vidor's threatened misappropriation would cause irreparable harm to Elevance Health for which it has no adequate remedy at law. Elevance Health cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation. As such, monetary damages alone cannot fully compensate Elevance Health for Vidor's threatened conduct.

129. Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Vidor's threatened misappropriation will cause Elevance Health irreparable damage and injury.

130. The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Vidor from such a restraint.

131. The public interest would not be disserved by the granting of an injunction. Congress enacted the Defend Trade Secrets Act to provide a federal remedy for trade secret misappropriation precisely because of the national interest in protecting American companies' intellectual property and competitive advantages. Enforcement of those protections serves the public interest.

**WHEREFORE**, Elevance Health, Inc. respectfully requests that the Court:

A. Set a hearing on Elevance Health's request for a temporary restraining order and preliminary injunction at the Court's earliest opportunity, and issue a temporary restraining order, preliminary injunction, and permanent injunction against Vidor as follows:

(i) prohibiting Vidor from directly or indirectly obtaining a Competitive Position with, or performing a Restricted Activity for or on behalf of, Oscar or any other Competitor, in the Restricted Territory, for twelve (12) months following his termination of employment with Elevance Health;

(ii) prohibiting Vidor from soliciting Elevance Health's employees for twelve (12) months following his termination of employment with Elevance Health;

(iii) prohibiting Vidor from using, disclosing, or appropriating Elevance Health's trade secrets and Confidential Information for so long as such information remains Confidential Information, and enjoining Vidor and all persons in active concert or

participation with him who receive actual notice of such order from using Elevance Health's trade secrets and confidential and proprietary information for any purpose pursuant to 18 U.S.C. § 1836(b)(3)(A) and Ind. Code § 24-2-3-3(a); and

(iv) directing Vidor to return to Elevance Health any and all Elevance Health Confidential Information in his possession, custody, or control.

B. Enter judgment awarding Elevance Health compensatory damages against Vidor in an amount to be determined at trial and directing Vidor to pay to Elevance Health his Stock Excess Value.

C. Award Elevance Health attorneys' fees, costs, and expenses as provided for in the Agreements, and as provided by law, and granting such other relief deemed appropriate by the Court.

FBT GIBBONS LLP

By: */s/ Patricia Román Hass*
Kandi Kilkelly Hidde, #18033-49
Patricia Román Hass, #29461-45
Cameron S. Trachtman, #36387-49
Logan W. Koehring, #38240-49
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN 46244-0961
Telephone: (317) 237-3800
Facsimile: (317) 237-3900
Email: khidde@fbtgibbons.com
promanhass@fbtgibbons.com
ctrachtman@fbtgibbons.com
lkoehring@fbtgibbons.com

*Attorneys for Elevance Health, Inc.*

0131135.0830109 4937-9626-9513v8